Two patent cases are from district courts. They're a trademark case from the PTO, an employee case, a veteran's case. The trademark case and the veteran's case are being submitted only in the brief and will not be argued. The first case is Synopsys v. Mentor, 2015-1599, Mr. Phillips. Good morning, Your Honors, and please the court. I think that the path to the correct outcome of this case was pretty well paved last month by this court in the Enfish opinion. What the court said there seems to me to apply in some ways with a vengeance here. Everyone cites Enfish. Well, I suspect my colleague won't, but I certainly cite Enfish. We are not faced with a situation where general purpose computer components are added post hoc to a fundamental economic practice or mathematical equation. Rather, the claims are directed to a specific implementation of a solution to a problem in the software arts. I know the court didn't have this case in mind when it wrote those words, but I don't know that you could describe exactly what we have in this case more clearly than the court did in the Enfish opinion. What I'm wondering about in terms of your case here compared to Enfish is if Enfish was a claim directed solely to the self-referential data table itself, and at least as that claim was organizing all of that data in the memory so that it could all be organized in a single table rather than having to use a whole string of tables for each individual data type. I guess the concern I have about trying to make a connection to Enfish here is that this claim, as I understand it, is not limited to something physical. No, it's a process claim. It's a process claim, but it's a process claim that is broad enough on its face to be performed by an individual with pen and paper, maybe even mentally. Judge Chin, I think the problem we have, if you take that to its logical consequence here, what you're basically saying is that software patents are ineligible for under section 101. No, I think that what Judge Chin said is that this claim can be performed mentally or by pen and paper. Please tell me whether or not the district court was correct in concluding that this claim is not limited to a computer, because for you to make a statement in response to Judge Chin about software is not listening to his question. His question, I think, pretty clearly indicated that this may not be construed as a software claim, in fact, maybe wasn't construed as a software claim by the district court below, since it obviously, according to the district court, is capable of being done by pen and paper, and the inventors seem to have admitted as much. So tell me why I should even view this as a software claim. Where are the computer limitations in this claim? Well, the claim itself, as the district court said, it's directed primarily to a computer, and indeed, the testimony is undisputed that no human would follow the process that's outlined in this patent in order to achieve the ultimate objective of coming up with a chip design. Nobody would follow this. You only follow this because you have a computer that you're trying to create inferences. But you're talking about the patent. You're not talking about the claim. This claim. Section one, right. This claim, claim number one, the district court concluded could be done with pen and paper by human being and was not limited to any application on any computer. In its simplest form. No, in the form as written. I mean, there's nothing as simple as form. It's not like there's a simple form of this claim in a complex form. There's only one form of this claim. It's the language the inventor chose to claim protection for. Right, but in order to create what is the true novelty in this I don't disagree with you that the specification contains in it a lot more detail and many references to computer code. But the problem is the claim doesn't. And this district court was not taxed with construing the patent or deciding whether there is any invention disclosed in the patent that would have been eligible for patentability. He's taxed with looking at the claim that you actually filed for protection for and deciding whether that But I think you have to read the claim in the context of the specification. And I'm not trying to limit the claim based on the specification. I'm reading it as it states, which is a series of steps that are clearly aimed at operating a computer because no human would follow those particular, would follow these steps. And it seems to me that when you're talking about steps that can only be used on a computer, the only way to read that is that this is in fact a software invention. And the fact that you can perform this in its simplest way by a pencil and paper is exactly what Judge Bryson on the district court in the TQP case said, no, that's not the answer. Sure, you can do these things, you know, simply in that context. An entire industry was created on the basis of this. That's true, but, you know, we're looking at one claim as the representative claim here. Claim one of 841 patent. Right. And when I, you know, when I look at those four lines of code, the if else statements, you know, it just almost slaps me across the face of thinking latch automatically. If a condition is met, then you pass the input into becoming the output. You know, that's a definition of a latch. You know, it's like, I don't know, like when I'm watching TV, a football game, and I see the defense lined up in a certain way, the linebackers and the defensive backs and the safeties in a certain position, I think that's a cover to defense. But Judge Chen, it seems to me what you're talking about there may go to the question of whether it's obvious, may go to the question of whether it's anticipated, but I don't think it goes to the question of whether it's patentable. Well, because nobody had been able, you know, there was no prior art by which you could identify where a computer could identify that as a latch prior to the creation of this invention. It feels like a key element of your argument is that we need to understand this claim in the context of some synthesizer tool on a computer for carrying out these steps. But right now, as I understand it, this claim was not construed that way. You aren't challenging the lack of a construction for that. In fact, if we're just left with a claim that broadly covers on its face the performance of these steps, either internally in a person's mind or by an individual with pen and paper, then is that the end of the case for you? Or do you have a backup argument for why, even if this claim could be categorized as a mental process, nevertheless, this is a patent eligible mental process? Right. And the reason it is, is because no human would perform this absolutely unquestioned. All the testimony says no human would go through these steps. These are steps that only make sense if you're trying to get a computer to effectively simulate the mental process that you're trying to develop. There's also testimony that a human did perform these steps by pen and paper, right? Right. But the reason why, but if you're going to write a patent and it's going to deal with a mental process that you're, because the computer can't think, right? So you have to set out exactly how to make the computer think. You're going to have to go through that mental process. And as I said before, the genius in this was the assignment conditions. That's the mechanism by which you can convert this, you know, human to computer language that the people who want new chips and want new manufacturing to create can then convert into a system that allows you to manufacture. Hypothetically, you could imagine a situation where inventors invented something really important, a very useful technical advance. But then at the same time, when you look at the claims, the claims are to such a stripped down elemental level that the claim itself doesn't exactly capture that. I mean, hypothetically, I think you can understand that. Sure, I can understand that as a hypothetical. Can we go to the assignment conditions though? Can you explain to me, I mean, I tried to understand these assignment conditions. It didn't look like your briefing devoted much time to, you know, grinding us down to help us understand what these assignment conditions truly are. But can you describe whether Gregory was the first one to really conceive of thinking about these functional logic descriptions? That's an answer. Yes, the answer to that is maybe my colleague will have something else he wants to say about that. But I have to say that, you know, if you look at the prior art, there is nothing like this use of these conditions anywhere in the prior art. So yes, he's, I mean, the undertaking, and he was very clear in his testimony about this. He said, look, I've got to find a way to take what people try to do by human pen and pencil and explain it to a computer so that the computer can do these massive inputs and then convert them into equally massive outputs that will allow chips to become what they are today. And he went through that process very specifically in order to allow the computer to infer. Going back to claim one though, again, this is a pretty simple logic device, a latch. And when I look at the assignment conditions here, and I'm trying to think what is description in this alternative but equivalent functional description, I'm trying to understand what was the twist here that made this such an interesting way of describing the functions? Because prior to this, there was no way for the computer to figure out how to create a latch, or to create a flip-flop, or to create an impedance. There was just simply no way. And those are fundamental elements in chip design. And so until you could actually get the computer to look at those, and claim one is the latch, but obviously the other two are embedded in the other claims as well. But until you could get the computer to actually implement that through the logical sequencing of a computer, then you could not do what this invention has done. And that's why literally an entire industry, billions of dollar industry, has been created as a consequence of this particular undertaking. And it seems to me that the district court's fundamental error here is focusing on this as a quote, mental process, rather than going back to the core notion of what Alice is all about. Because what Alice is all about is taking ordinary human endeavors, and nobody knows Alice better than I do I suppose I can say with some confidence, and then just adding a computer to it. And this is to my mind at least the polar opposite of that. This is recognizing that in a very complicated technological field, you need to devise a method of allowing that computer to process information in a unique way that no one else had ever seen, and to do it in a way that allows you with an outcome that no one else could have ever anticipated. I haven't looked at all the other patent claims that your client has. Do some of those claims recite this invention in the context of a computer loaded with this software tool carrying out and executing all these different... Not as much as the specification it seems to me speaks in those terms. Again, the district court recognized herself specifically that this is as I say, it's undisputed that no human would follow this particular process. We'll save your rebuttal time Mr. Phillips and perhaps restore it to three minutes. Mr. Vandenberg. Please the court, I'd like to address her on the claim construction issue, and then explain assignment condition, and then speak as to the prior art whether that was novel or not. On the issue of whether the claims require a computer, we submit synopsis waive that point. We submitted 29 pages of expert declaration explaining that every claimed method could be performed in one's head or pencil and paper without using any machine, and that is a joint appendix 2983 to 3012. Are you saying could be and was? Could be, was by these named inventors. We also conceded that as in Benson, in the commercial world, if one is making an actual integrated circuit, you're not going to do that on the whiteboard. You're going to use computer software. In fact, both of our clients depend on that for their livelihoods. So is it possible that one of ordinary skill in the art reading these claims would look at these steps and think this would only be performed in the context of a computer software tool, and it's not, nobody would ever read these claim steps and think that a human being would be doing it individually with pen and paper? Well, no, your honor, in the sense of a claim construction, the question, to the extent the question asks whether these claims are properly construed as requiring computer and software, they did not, Synopsys did not seek that. In the case of claim construction, is it 2375, Synopsys took the position that the preamble was not limiting, and for every claim term that was construed, they did not, and nor did we, read in anything tangible, did not seek anything tangible. Again, in our summary judgment, we identified one fact as being material, namely that the person of skill could do this mentally. That was undisputed. In fact, when the judge asked counsel for Synopsys at the summary judgment hearing, what about Mentor's point that these claims do not require a computer? She responded that they do not require a computer, JA 2080, they agreed no computer. In their brief, in the summary judgment, I'm just curious, you know, this is a 65-column patent, and when you read it, it feels like there's something technical going on. Is it your view that what has happened here is that there is perhaps something patent eligible going on with what Mr. Gregory invented, but it just didn't come through and get fully realized in the claims? I think not. I think another way of putting it is, if these claims are no good, how could these claims be redrafted so that they would be passing 101? It is conceivable that had one written the claims differently, one could have gotten to the point of an Enfish-type claim or DDR-holding claim where you indeed had a better computer, where you had an invention that made the computer operate in a better way. This, however, is like Fluke or Benson. But as a general matter, synthesis tools, you know, for translating HDL into logic circuit components, I mean, that sounds like something that, you know, assuming software is patent eligible, that this would be a type of software that you would likely find patent eligible material in there. I would submit if and only if there was persuasion as in Enfish that it improved the computer's operation, it made the computer process better, or as in Enfish, Enfish claimed configuring, that was in the claim, computer memory. So it was a better computer memory. One way of distinguishing is when you ran the process in Enfish, you ran that process and you put the self-referential table and you stood back, you now had a better computer. For the next application you ran, whether it was browsing or anything else, you had a better computer. You now had a computer that could store faster, could be more efficient. When you run this method, it is no different than running calculating E equals MC squared. It could be, it could be... I guess, but what if one could say that the synthesis tool, you know, as if it's claimed in an instantiated way, that's carrying out these steps, what you have now is a way of drafting HDL that doesn't require you to expressly describe the logic You can just stick with the signals. Well, two answers to that. One is, with respect as to the point that it relates to sort of technology, that was true in Benson too. The whole point in Benson was you were converting from binary decimal to binary. The court said the primary purpose of this is for use in computers. However, the court said one could do it by hand and therefore it was a mental process. Very similar. But, you know, if you take Benson to its potential logical extension or one interpretation of Benson, then what you're really saying is almost any kind of coding is a mental process and therefore any kind of software is a mental process and therefore all software loaded on a computer is patent ineligible. I mean, there has to be a breaking point somewhere, even in your position, right? Enfish and DDR Holdings are perfectly consistent with Benson. The distinction is that in Benson there was value in a thought process. That value existed whether or not it was run on the computer. Yes, it was well suited and intended for running on a computer, but running that process in the computer didn't improve the computer. In Enfish, running that process, configuring a memory to be a self-referential tailor, that's a better computer. DDR was a better web server. Those are the distinctions. Fluke clearly was a technical environment. We're talking about catalytic conversion, updating alarm limits. The court said that's intended to be run on a computer. Of course, you're not going to have people by hand because the conversion process could blow up while you're doing your math. You seem to be thinking that only software that improves the quality of the Is that right? Is that where you really think the limit is? Is that narrowly defined? No, Your Honor. There are other instances, such as in the Abili case, which Ingray-Bilski on Bonk adopted, was a case where you had essentially the machine or transformation test was sort of met in a virtual way, where you had virtual, it was a CAT scan type of thing, and you displayed. There are all sorts of instances. That's what I'm wondering. Are you it to a computer or, say, a CAT scan or, I don't know, basically any kind of machine, if the operation of that machine is significantly improved by virtue of a software program, would that fall into the NPHISH and DDR category, according to you? Or is it literally only improving the operation of a computer, in particular, improving the operation of any other machine would be irrelevant? No, it would be the former, such as was an improvement of another machine, and it really goes to whether there's a functional relationship as claimed. The name of the game is the claim, so one has to look at the claim. This is a claim that is purely intangible, and, again, that was undisputed, and I'm not aware of any Supreme Court or this Court's decision. Well, I guess what I was trying to explore with you is something that was truly a computerized version of this that perhaps would then potentially change the character of the claim so that one could see and therefore argue that it necessarily is some kind of improvement to computer technology. I mean, we've got another case coming after yours that deals with emulators and debuggers and everything else with respect to making sure we have these IC designs in working order in light of the HDL, and, I mean, I don't know where your position stops. Are you saying that all of those are likewise patent-ineligible inventions? No, Your Honor, all our clients' patents are patent-ineligible. Yeah, of course they are. But the distinction, again, is to focus... There's two points about this. One is the claim, and it was waived, and it was undisputed that this can be done mental process. Again, we put in expert declaration, thought process. Another thing I'll point on that and get to the second part is even in the blue brief, synopsis quoted with approval, the district court's reference to this claim as being directed to a thought process, and that's blue brief, page 39, last line of the footnote. So that was unchallenged here. The other aspect is... So the claim, there's no... It's purely intangible, like Digitac, like... Okay, but let me just try to be as direct as I can to try and give an answer to the question I think that Judge Chen has asked you repeatedly, was if this claim was not drafted in a way that included mental performance or pen-and-paper performance, but was clearly and unequivocally limited to performing these steps on a computer, would it be patent-eligible? I don't know. It would depend if there was record evidence to show that somehow that either created an improved data structure, it had some physical improvement if they claimed downstream steps that led to place and route of circuits, et cetera. It would all depend. But it is conceivable, certainly. We have a lot of... No, this claim with computer limitations in it, not additional downstream steps, not moving away from anything other than the steps of this claim, but suppose at the end of every single step it said performed on a computer. No, that would not be patent-eligible. And if I may respond to that, and also the Judge Chen's earlier question about assignment condition by inviting the court to the red brief, page 9, which has the example in... So I can explain what this thought process is and why it has nothing... It doesn't improve a computer. It's more like Benson. The thought, the example, the patent's only example for claim 1 is the red brief, page 9, table 8, table 9, and then the schematic. Table 8 is the Boolean logic equation that Judge Chen referenced, and basically it deals with three variables, Q, D, and COND. And all it says is that Q is given the value of D if and only if COND is true. So Q is given the value of D if the condition COND is true. The table 9 is simply a different way of thinking about that, and that's what assignment conditions are. It's a different way of thinking of that equation, and specifically what the assignment conditions are is you look at the equation, you say, okay, when is Q given a new value? And when it's given a new value, what is that new value? The when is the first thing we see in table 9 next to the variable Q. It's called AL. It's talking about when is a new value loaded? Also loading is the same as assigning or setting a value. It is loaded when COND is true. You move to the right, and it says COND and D. D is the new value that's loaded. So all they did here, and on this record there's no evidence that someone else previously had thought of logic equations using assignment conditions in response to your question, so we did not argue this was an old idea. But all this is is to think about it, look at the equation, say, okay, when and what value, you know, when is Q given a new value and what is that new value? And then the method, the thought process applies a rule. It tells people, people who don't recognize a latch when they see it, that, oh, if those two values are non-constant or variable, as is true here because COND is a variable and D is a variable, then, you know, sir, what you have is a latch, and we want you to draw it this way. Draw the latch. It has two inputs, COND and D, and your understanding that, I guess, the computer would not be able to read what's in table eight and understand that and infer that that represents a latch, but it looks at what's in table nine, and somehow the computer, table nine is drafted in a way that understands how a computer thinks, and so therefore what's in table nine is something that a computer can understand and then now automatically generate a listing of a latch in the net list. I would say that's correct, but missing one element. The computer understands it only because it's programmed with the rule. It will have a set of rules, and it will say, if your assignment conditions are both non-constant, have a latch. If this other thing is constant, you output a wire, so you tell, you simply tell the computer what to do. Now, computers could have got to the same place before. You simply could have, you know, put in the computer, if you see table eight, output a schematic of a latch, right? So it's really no different, but we'll assume it's improved because having a set of rules rather than taking up a lot of space with all these different formulas is advantageous. Very similar to Benson. In Benson, people knew how to convert from binary decimal to binary. They looked it up in a table, but, and the computer could have been loaded with that table, so the computer could have done it in a quick way, but it would have taken up more space. So in Benson, they took a one-step manual process, and they turned it into seven steps, well suited for a computer. Computer knows how to move zeros and ones in a shift register, so now the computer could emulate what humans could already do. That's exactly this case. A computer could now emulate what experts or skilled artisans could already do. The, you know, basically, again, why, you know, Fluke, Benson, in this case, are on one side, whereas Enfish and DDR are on the other side, and I'm not saying this applies to every case in the future, is simply that on the one side, there's an improvement to the way computers work, which, you know, is a subset of Deere, improvement to the way a machine works. On the other side, it's simply a thought process, which is conceded and admitted in this case, a thought process, that is well-suited for use on a computer. That was Benson. That was cybersource. That was Fluke, and the Supreme Court in this court, 10 times now, as we've counted, has said that mental processes are ineligible. Mayo quoted Benson saying that, cybersource, smart gene, et cetera, cyber phone, et cetera. So given that they conceded below, in the trial court, sorry, that this was entirely a mental process, there's no tangible element, and also they did not appeal the finding that the machine or transformation test was failed here. They did not appeal that. Given those findings, Mr. Phillips has three minutes. Thank you, Your Honor. Appreciate it. First of all, it seems to me that the notion that this could be done by hand doesn't tell you anything about the nature of this particular invention. Judge Shen, I think you actually nailed it right on the head when you said the computer can't read Table 8, the computer can read Table 9, and it is the conversion into that Table 9 that is the invention that was the basis for this. It works on a computer. It only works on a computer. No human would go through that operation, and my friend did concede there was no prior ability to do this. There is no prior art in this regard, and it seems to me what he said about Benson is exactly the distinction that the court has to draw here. In Benson, everybody knew how to convert from binary to other numbers, right? Everybody knew how to do that, and then you just add a computer in order to make it happen faster. That was not the purpose of this exercise. The purpose of this exercise, not in the long run, it clearly will make the computers work better just as it does every other, but Enfish and Alice both say that subject matter eligibility is if it improves the computer or if it improves a field of technology, and the field of technology here is electronic design automation or synthesis as you quite rightly identify it. That's the technology, and this is an extraordinary advance on that technology, and it falls squarely into what the court said in Alice and I think what Enfish said. This kind of software has to be protected under these circumstances, and if you're going to go back to the core principles and just look at what is it that is designed to prevent preemption of broad concepts, and whatever else you could say about this, this is a very specific, precise way of dealing with a problem on a computer in a technology that will have virtually zero preemptive effect and none beyond the preemptive effect you would ever otherwise get in any case where you get a patent because the monopoly obviously allows that much preemption. That's all we're asking for in this case, and for that reason the judgment should be reversed. If there are no further questions. Thank you, Mr. Phillips. We appreciate the excellent arguments on both sides. We'll take the case on revised.